No. 14-60295

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**PILGRIM'S PRIDE CORPORATION, Successor in Interest to Pilgrim's Pride Corporation of Georgia, formerly known as Gold Kist, Incorporated, Successor in Interest to Gold Kist, Incorporated and Subsidiaries,**

**Petitioner - Appellant**

v.

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent - Appellee**

---

## ON APPEAL FROM THE UNITED STATES TAX COURT

---

## RECORD EXCERPTS
## PILGRIM'S PRIDE CORPORATION

---

> BAKER & MCKENZIE LLP
> ROBERT H. ALBARAL
> TODD A. SCHROEDER
> 2300 Trammell Crow Center
> 2001 Ross Avenue
> Dallas, Texas 75201
> (214) 978-3000
> ATTORNEYS FOR APPELLANT,
> PILGRIM'S PRIDE CORPORATION

# RECORD EXCERPTS TABLE OF CONTENTS

**Tab**                                                                 **Record Cite**

1. DOCKET SHEET

2. NOTICE OF APPEAL ............................................................... R. 31

3. NOTICE OF FILING OF NOTICE OF APPEAL ................................. R. 32

4. TAX COURT DECISION APPEALED .................................... R. 30

5. TAX COURT OPINION APPEALED .................................... R. 23

6. ORDER DATED MARCH 6, 2014 ....................................... R. 29

7. ORDER DATED MAY 20, 2013 ........................................... R. 20

8. CERTIFICATE OF SERVICE

9. ECF CERTIFICATION

Tab 1

U N I T E D   S T A T E S   T A X   C O U R T
D O C K E T   E N T R I E S

Docket No.   012089-10                                                                        INDEX

Pilgrim's Pride Corporation Successor in Interest to Pilgrim's Pride Corporation of Georgia f/k/a Gold Kist, Inc.; Successor in Interest to Gold Kist Inc. and Subsidiaries

v. COMMISSIONER OF INTERNAL REVENUE

Pilgrim's Pride Corporation
4845 US Highway 271, North
Pittsburgh, TX  75686-0093

Petitioner Counsel       (Total 02)

AR0375      Albaral, Robert H.
Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201

ST0466      Schroeder, Todd A.
er & McKenzie, LLP
00 Trammel Crow Center
2001 Ross Avenue
Dallas, TX  75201

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Pilgrim's Pride Corporation of Georgia
4845 US Highway 271, North
Pittsburg, TX  75686-0093

Petitioner Counsel       (Total 02)

AR0375      Albaral, Robert H.
Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201

466      Schroeder, Todd A.
Baker & McKenzie, LLP
2300 Trammel Crow Center
2001 Ross Avenue
Dallas, TX  75201

Respondent Counsel     (Total 04)

DJ0801      Duncan, John Wayne
4041 N. Central Avenue
Suite 112
Mail Stop 2200 PX
Phoenix, AZ  85012

HR0969      Hosler, Rick V.
4041 N. Central Avenue
Suite 112
Mail Stop 2200 PX
Phoenix, AZ  85012

CJ1070      Cuatto, Jan Robert
4041 N. Central Avenue
Suite 112
Mail Stop 2200 PX
Phoenix, AZ  85012

SD0534      Susi, Doreen Marie
4041 N. Central Avenue
Suite 112
Mail Stop 2200 PX
Phoenix, AZ  85012

* * * * * * * * * * * * * * * * * * *

Gold Kist Inc. and Subsidiaries
4845 US Highway 271, North
Pittsburgh, TX 75686-0093

Petitioner Counsel    (Total 02)

AR0375    Albaral, Robert H.

Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201

ST0466    Schroeder, Todd A.

Baker & McKenzie, LLP
2300 Trammel Crow Center
2001 Ross Avenue
Dallas, TX 75201

Docket No.    012089-10                                                                      INDEX

| NO. | DATE | EVENT | FILINGS AND PROCEEDINGS | ACT/STAT DTE | SERVED | | M |
|-----|------|-------|------------------------|--------------|--------|---|---|
| 0001 | 05/26/2010 | PF | PETITION Filed:Fee Paid | | R | 05/28/2010 | |
| 0002 | 05/26/2010 | REQT | REQUEST for Place of Trial at Dallas, TX | | R | 05/28/2010 | |
| 0003 | 05/26/2010 | DISC | OWNERSHIP Disclosure Statement | | R | 05/28/2010 | |
| 0004 | 07/23/2010 | ACS | ANSWER (C/S 07/22/10). | | | | |
| 0005 | 01/04/2011 | OCA | ORDER that caption of case is amended. | | B | 01/04/2011 | |
| 0006 | 01/10/2011 | NTD | NOTICE of Trial on 06/13/11 at Dallas, TX. | | B | 01/10/2011 | |
| 0007 | 01/10/2011 | SPTO | STANDING PRE-TRIAL ORDER attached to Notice of Trial | | B | 01/10/2011 | |
| 0008 | 05/17/2011 | JMOT | JOINT MOTION to submit case under Rule 122. | ORD 05/19/2011 | | | |
| 0009 | 05/17/2011 | STP | STIPULATION OF FACTS w/Exhs. | | | | |
| 0010 | 05/19/2011 | OSUB | ORDER that case is submitted to Judge Halpern. Opening briefs due: 6/15/11 & Reply briefs due 8/15/11. Joint motion to submit case under Rule 122 is granted. Trial is continued. | | B | 05/20/2011 | |
| 0011 | 06/15/2011 | BFR | BRIEF for resp. | | P | 06/16/2011 | |
| 0012 | 06/15/2011 | BFP | BRIEF for petr. | | R | 06/16/2011 | |
| 0013 | 08/15/2011 | RBFR | REPLY BRIEF for resp. | | P | 08/16/2011 | |
| 0014 | 08/15/2011 | RBFP | REPLY BRIEF for petr. | | R | 08/16/2011 | |
| 0015 | 05/21/2012 | OSUB | ORDER that case is submitted to Judge Gustafson. Case is no longer submitted to Judge Halpern. | | B | 05/22/2012 | |
| 0016 | 06/29/2012 | O | ORDER parties by 7-30-12 shall file a supplemental reply brief. | | B | 07/02/2012 | |
| 0017 | 07/30/2012 | SUPP | SUPPLEMENTAL REPLY BRIEF for resp. | | P | 08/02/2012 | |
| 0018 | 07/30/2012 | SUPP | SUPPLEMENTAL REPLY BRIEF for petr. | | R | 08/02/2012 | |
| 0019 | 04/23/2013 | OSUB | ORDER that case is submitted to Judge Dawson. Case is no longer submitted to Judge Gustafson. | | B | 04/24/2013 | |
| 0020 | 05/20/2013 | O | ORDER parties by 7-5-13 file a second supplemental reply brief. | | B | 05/21/2013 | |
| 0021 | 07/02/2013 | MISC | SECOND SUPPLEMENTAL REPLY BRIEF for resp. | | P | 07/08/2013 | |
| 0022 | 07/05/2013 | MISC | SECOND SUPPLEMENTAL REPLY BRIEF for petr. | | R | 07/08/2013 | |

Docket No.   012089-10                                                                                      INDEX

| NO. | DATE | EVENT | FILINGS AND PROCEEDINGS | ACT/STAT DTE | | SERVED | M |
|---|---|---|---|---|---|---|---|
| 0023 | 12/11/2013 | TCOP | T.C. OPINION, Judge Dawson   141 T.C. No. 17 (Decision will be entered for resp. with respect to the deficieny and for petr. with respect to the accuracy-related penalty.) | | B | 12/11/2013 | |
| 0024 | 01/10/2014 | M028 | MOTION FOR RECONSIDERATION OF FINDINGS OR OPINION PURSUANT TO RULE 161 by Petrs. Pilgrim's Pride Corporation, Pilgrim's Pride Corporation of Georgia f.k.a. Gold Kist, Inc., Gold Kist Inc. and Subsidiaries (OBJECTION) | ORD 03/06/2014 | R | 01/14/2014 | |
| 0025 | 01/10/2014 | M000 | MOTION FOR FULL COURT REVIEW. by Petrs. Pilgrim's Pride Corporation, Pilgrim's Pride Corporation of Georgia f.k.a. Gold Kist, Inc., Gold Kist Inc. and Subsidiaries (OBJECTION) | DNM 03/06/2014 | R | 01/14/2014 | |
| 0026 | 01/15/2014 | O | ORDER resp. by 2-18-14 file a response to motion for reconsideration. | | B | 01/15/2014 | |
| 0027 | 02/18/2014 | RSP | RESPONSE TO MOTION by petr. for reconsideration. by Resp. | | P | 02/18/2014 | |
| 0028 | 03/06/2014 | DNM | DENIED MOTION FOR FULL COURT REVIEW. by Petrs. Pilgrim's Pride Corporation, Pilgrim's Pride Corporation of Georgia f.k.a. Gold Kist, Inc., Gold Kist Inc. and Subsidiaries | | B | 03/10/2014 | |
| 0029 | 03/06/2014 | O | ORDER THAT PETR. MOTION FOR RECONSIDERATION IS DENIED. | | B | 03/10/2014 | |
| 0030 | 03/10/2014 | DEC | DECISION ENTERED, JUDGE DAWSON | | B | 03/10/2014 | |
| | | | A P P E L L A T E   P R O C E E D I N G S | | | | |
| 0031 | 04/14/2014 | NOAP | NOTICE OF APPEAL BY PETR(S). TO U.S.C.A. 5TH CIR. | | B | 04/17/2014 | C |
| 0032 | 04/17/2014 | NOFC | NOTICE OF FILING W/ COPY OF NOT. OF APP. SENT TO THE PARTIES. | | B | 04/17/2014 | C |

Tab 2

US TAX COURT
RECEIVED

APR 14 2014

CT

US TAX COURT
FILED

APR 14 2014

PILGRIM'S PRIDE CORPORATION SUCCESSOR IN
INTEREST TO PILGRIM'S PRIDE CORPORATION OF
GEORGIA F/K/A GOLD KIST, INC., ET AL

Petitioner(s)

PAPER FILED

v.

Docket No.   12089-10

COMMISSIONER OF INTERNAL REVENUE,

Respondent

# NOTICE OF APPEAL

SERVED Apr 17 2014

U.S. TAX COURT
RECEIVED

APR 1 4 2014

HAND DELIVERED

**NOTICE OF APPEAL TO A COURT OF APPEALS**
**FROM A DECISION OF THE UNITED STATES TAX COURT**

UNITED STATES TAX COURT
Washington, D.C.

| | | |
|---|---|---|
| PILGRIM'S PRIDE CORPORATION | ) | |
| SUCCESSOR IN INTEREST TO | ) | |
| PILGRIM'S PRIDE CORPORATION OF | ) | |
| GEORGIA F/K/A GOLD KIST, INC. | ) | |
| SUCCESSOR IN INTEREST TO GOLD | ) | |
| KIST INC. AND SUBSIDIARIES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. 12089-10 |
| | ) | |
| | ) | |
| COMMISSIONER OF INTERNAL REVENUE, | ) | |
| | ) | |
| Respondent. | ) | |

**NOTICE OF APPEAL**

Notice is hereby given that Petitioner hereby appeals to the United States Court of Appeals for the Fifth Circuit from the decision of this Court that Petitioner is liable for a deficiency of $29,682,682 in its Federal income tax for the tax year ending June 30, 2004, entered in the above captioned proceeding on the 10th day of March, 2014.

1

Respectfully submitted,

Dated: April 11, 2014

ROBERT H. ALBARAL
T.C. No. AR0375
Robert.Albaral@Bakermckenzie.com

Dated: April 11, 2014

TODD A. SCHROEDER
T.C. No. ST0466
Todd.Schroeder@Bakermckenzie.com

Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas  75201
(214) 978-3000

Attorneys for Petitioner,
Pilgrim's Pride Corporation
Successor in Interest to
Pilgrim's Pride Corporation of
Georgia f/k/a Gold Kist, Inc.
Successor in Interest to Gold
Kist Inc. and Subsidiaries

Tab 3



C7

**UNITED STATES TAX COURT**
WASHINGTON, D.C. 20217
April 17, 2014

CLERK OF THE COURT

| | |
|---|---|
| PILGRIM'S PRIDE CORPORATION SUCCESSOR IN INTEREST TO PILGRIM'S PRIDE CORPORATION OF GEORGIA F/K/A GOLD KIST, INC., ET AL., | ) ) ) ) ) |
| Petitioner | ) ) ) |
| v. | ) ) Docket No. 12089-10 |
| COMMISSIONER OF INTERNAL REVENUE, | ) ) ) |
| Respondent | ) ) |

NOTICE OF FILING OF NOTICE OF APPEAL

TO:

Lyle W. Cayce
  Clerk
U. S. Court of Appeals
  for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

William J. Wilkins
Chief Counsel
Internal Revenue Service
1111 Constitution Ave, NW
Washington, DC 20224

Robert H. Albaral
Baker & McKenzie, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201

  The United States Court of Appeals for the 5th Circuit and the parties are hereby notified that on April 14, 2014, petitioner filed a Notice of Appeal from the decision of the Tax Court. A copy of that Notice of Appeal is herewith served upon you.

  The parties are hereby notified that the original papers constituting the record of the case in the United States Tax Court include any transcripts of proceedings. The record on appeal will be sent to the United States Court of Appeals on May 14, 2014.

  Counsel for the Commissioner of Internal Revenue are **GILBERT S. ROTHENBERG, CHIEF, APPELLATE SECTION, TAX DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, P.O. BOX 502, WASHINGTON, D.C. 20044, UPON WHOM SERVICE OF DOCUMENTS AND PAPERS IN PROCEEDINGS IN THE COURT OF APPEALS IS TO BE MADE,** and William J. Wilkins, Chief Counsel, Internal Revenue Service.

Robert R. Di Trolio
Clerk of the Court

Enclosures: Certified Copy of Notice of Appeal and Docket Entries.

Fee Paid:    Yes XXX    No

SERVED APR 17 2014

Tab 4

ORIGINAL

SYM

## UNITED STATES TAX COURT
### WASHINGTON, DC 20217

PILGRIM'S PRIDE CORPORATION )
SUCCESSOR IN INTEREST TO PILGRIM'S )
PRIDE CORPORATION OF GEORGIA F/K/A )
GOLD KIST, INC., ET AL, )
                               )
        Petitioner, )
                               )
        v. )  Docket No. 12089-10.
                               )
COMMISSIONER OF INTERNAL REVENUE, )
                               )
        Respondent )
                               )
                               )

## DECISION

Pursuant to the Court's Opinion (141 T.C. No. 17) filed in this case on December 11, 2013, it is

ORDERED and DECIDED:  That petitioner is liable for a deficiency of $29,682,682 in its Federal income tax for the tax year ending June 30, 2004; and that petitioner is not liable for any accuracy-related penalty under section 6662(a), I.R.C., for the tax year ending June 30, 2004.

*Howard A. Dawson Jr.*

Howard A. Dawson, Jr.
Judge

ENTERED:    **MAR 10 2014**

**SERVED Mar 10 2014**

Tab 5

141 T.C. No. 17

UNITED STATES TAX COURT

PILGRIM'S PRIDE CORPORATION SUCCESSOR IN INTEREST TO
PILGRIM'S PRIDE CORPORATION OF GEORGIA f.k.a. GOLD KIST, INC.
SUCCESSOR IN INTEREST TO GOLD KIST INC. AND SUBSIDIARIES,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12089-10.                    Filed December 11, 2013.

    P is the successor in interest to G.  G was contractually
obligated to purchase, and in 1999 did purchase, securities from S and
T for $98.6 million.  The securities were capital assets of G.  In 2004
S offered to redeem the securities for $20 million.  G's board of
directors decided to abandon the securities for no consideration
because a $98.6 million ordinary loss would produce tax savings
greater than the $20 million offered by S.  On June 24, 2004, G
voluntarily surrendered the securities to S and T for no consideration.
On its Federal income tax return for the tax year ending June 30,
2004, G reported a $98.6 million ordinary abandonment loss
deduction under I.R.C. sec. 165(a) pursuant to sec. 1.165-2(a),
Income Tax Regs.

    An abandonment loss cannot be claimed on a sale or exchange
of property.  Sec. 1.165-2(b), Income Tax Regs.  Pursuant to I.R.C.

SERVED DEC 1 1 2013

- 2 -

sec. 165(f) losses from sales or exchanges of capital assets are subject
to the limitations on capital losses under I.R.C. secs. 1211 and 1212.
I.R.C. sec. 1234A requires gain or loss attributable to the
cancellation, lapse, expiration, or other termination of a right with
respect to property that is (or on acquisition would be) a capital asset
in the hands of a taxpayer to be treated as gain or loss from the sale of
a capital asset.

    <u>Held</u>:  the securities are intangible property comprising rights
that G had in the management, profits, and assets of S and T.  Those
rights were terminated when G surrendered the securities.

    <u>Held</u>, <u>further</u>, the $98.6 million loss on the surrender of the
securities is attributable to the termination of G's rights with respect
to the securities, which are capital assets, and pursuant to I.R.C. sec.
1234A the loss is treated as a loss from the sale or exchange of capital
assets.

    <u>Held</u>, <u>further</u>, G is not entitled to an ordinary loss deduction for
abandonment, because the loss is treated as a loss from the sale or
exchange of capital assets pursuant to I.R.C. sec. 1234A.  <u>See</u> sec.
1.165-2(b), Income Tax Regs.

    <u>Held</u>, <u>further</u>, pursuant to I.R.C. sec. 165(f), P's losses from the
surrender of the securities, deemed to be a sale or exchange under
I.R.C. sec. 1234A, are subject to the limitations on capital losses
under I.R.C. secs. 1211 and 1212.


<u>Robert H. Albaral</u> and <u>Todd A. Schroeder</u>, for petitioner.

<u>John Wayne Duncan</u> and <u>J. Greg Marble</u>, for respondent.

- 3 -

## OPINION

DAWSON, <u>Judge</u>: Petitioner petitioned the Court pursuant to section 6213(a) and (f)(1)[1] for redetermination of a $29,682,682 deficiency in Federal income tax and a $5,936,536 accuracy-related penalty under section 6662(a) that respondent determined against petitioner as successor in interest to Gold Kist Inc. (GK Co-op), a Georgia cooperative marketing association, for its tax year ending June 30, 2004. After a concession by respondent,[2] the only issue remaining for decision is whether a $98.6 million loss resulting from GK Co-op's abandonment of certain securities in 2004 is ordinary or capital.

### Background

This case was submitted fully stipulated pursuant to Rule 122.[3] The stipulation of facts and the exhibits attached thereto are incorporated herein by this

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) of 1986 in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that petitioner is not liable for the accuracy-related penalty under sec. 6662(a) for the year at issue.

[3]On April 24, 2013, this case was reassigned by order of the Chief Judge to Judge Howard A. Dawson, Jr., for disposition.

- 4 -

reference.  At the time petitioner filed its petition its principal place of business was in Pittsburg, Texas.

Petitioner is a corporation organized under the laws of the State of Delaware.  It is the successor in interest to Pilgrim's Pride Corp. of Georgia f.k.a. Gold Kist, Inc., a Delaware corporation (GK Inc.), which was the successor in interest to Gold Kist Inc., a Georgia cooperative marketing association (GK Co-op).  GK Co-op was organized as a cooperative association in 1936 under the Georgia Cooperative Marketing Act.  Beginning in 1978, GK Co-op was taxed as a nonexempt cooperative under subchapter T of the Code and was required to file an annual Form 990-C, Farmers' Cooperative Association Income Tax Return.

In 1999 GK Co-op was contractually required to purchase certain securities for an aggregate total of $98.6 million from Southern States Cooperative, Inc. (Southern States), and Southern States Capital Trust I (Trust), a Delaware statutory trust established by Southern States.[4]  Consequently, on October 5, 1999,

---

[4]Pursuant to an asset purchase agreement dated July 23, 1998, GK Co-op agreed to sell one of its divisions to Southern States for approximately $255 million paid in part in cash and in part by Southern States' assumption of certain liabilities.  The sale was completed in October 1998.  Southern States obtained a bridge loan which it expected to repay with funds raised in a public offering.  As part of the financing arrangement, when Southern States failed to consummate the public offering by October 5, 1999, it required GK Co-op to purchase the securities central to the issue in this case.  Southern States and the Trust filed a
(continued...)

- 5 -

GK Co-op purchased 40,000 shares of Step-Up Rate Series B Cumulative

Redeemable Preferred Stock (series B preferred stock)[5] of Southern States for

---

[4](...continued)
Form S-1 with the U.S. Securities and Exchange Commission to register (i) capital securities in the Trust for sale to the public and (ii) common securities in the Trust for sale to Southern States.  Southern States intended to use the proceeds from the sale of these securities to repay the outstanding principal balance of the bridge loan.

[5]The certificate evidencing the series B preferred stock states:

This certifies that Gold Kist Inc. [GK Co-op] is the owner of Forty Thousand (40,000) fully-paid and non-assessable shares of the Step-Up Rate Series B Cumulative Redeemable Preferred Stock, of the par value of $100.00 each, with a stated liquidation preference of $1000.00 per share, of Southern States Cooperative, Incorporated (the "Association"), transferable on the books of the Association by the holder hereof in person or by duly authorized attorney upon the surrender of this certificate properly endorsed.

    *      *      *      *      *      *      *

The Association will furnish to any stockholder without charge, upon written request, a full statement of the designations, preferences, limitations and relative rights of the shares of the Step-Up Rate Series B Cumulative Redeemable Preferred Stock and to each other class or series of shares of the Association.

The shares represented hereby have not been registered under the Securities Act of 1933 or under the securities laws of any state and are subject to certain restrictions on the transfer hereof, which restrictions are set forth in Section 9 of Article C(1)(c) of the Articles of Incorporation of the Association and in a Purchase Agreement of even date herewith between the Association and Gold Kist Inc.

- 6 -

$39.2 million and 60,000 shares of Step-Up Rate Capital Securities, Series A

(series A securities)[6] issued by the Trust for $59.4 million.  The series B preferred

_____

[6]The certificate evidencing the series A securities states:

Southern States Capital Trust I, a statutory business trust created under the laws of the State of Delaware (the "Issuer Trust"), hereby certifies that Gold Kist, Inc. [GK Co-op] (the "Holder") is the registered owner of Sixty thousand (60,000) capital securities (aggregate Liquidation Amount Sixty Million ($60,000,000) Dollars) of the Issuer Trust representing a preferred undivided beneficial interest in the assets of the Issuer Trust and designated the Step-up Rate Capital Securities, Series A (liquidation amount $1,000 per Capital Security) (the "Capital Securities").  The Capital Securities are transferable on the books and records of the Issuer Trust, in person or by a duly authorized attorney, upon surrender of this certificate duly endorsed and in proper form for transfer as provided in Section 5.5 of the Trust Agreement (as defined below).  The designations, rights, privileges, restrictions, preferences and other terms and provisions of the Capital Securities are set forth in, and this certificate and the Capital Securities represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Amended and Restated Trust Agreement of the Issuer Trust, dated as of October 5, 1999, as the same may be amended from time to time (the "Trust Agreement"), among Southern States Cooperative, Incorporated, an agricultural cooperative corporation organized under the laws of Virginia, as Depositor, First Union National Bank, as Property Trustee, First Union Trust Company, National Association, as Delaware Trustee, and the Administrative Trustees named therein, including the designation of the terms of the Capital Securities as set forth therein.  The Holder is entitled to the benefits of the Guarantee Agreement, dated as of October 5, 1999 (the "Guarantee Agreement"), entered into by Southern States Cooperative, Incorporated and First Union National Bank, as guarantee trustee, to the extent provided therein.  The Issuer Trust will furnish a copy of

(continued...)

- 7 -

stock and the series A securities, collectively referred to herein as the Securities, are securities as defined in section 165(g)(2).

The Securities generally provided for quarterly dividend payments that under certain circumstances could be unilaterally deferred by Southern States. Southern States ceased paying and began to defer the quarterly dividends payable on the series B preferred stock beginning with the April 2002 quarterly dividend. In October 2002 Southern States notified GK Co-op that the quarterly dividends on the series A securities for that quarter and subsequent quarters were deferred and would not be paid by Southern States.

In early 2004 Southern States offered to redeem the Securities from GK Co-op for less than GK Co-op had paid for them.[7] At that time GK Co-op was planning to merge with and into its wholly owned subsidiary GK Inc., a for-profit business corporation taxable under subchapter C of the Code, and to take the

---

[6](...continued)
the Trust Agreement and the Guarantee Agreement to the Holder without charge upon written request to the Issuer Trust at its principal place of business or registered office.

Upon receipt of this certificate, the Holder is bound by the Trust Agreement and is entitled to the benefits thereunder.

[7]The terms of the Securities neither required Southern States to offer to redeem the Securities from GK Co-op nor required GK Co-op to accept such an offer or make a counteroffer.

- 8 -

company public shortly after the end of its 2004 tax year.  GK Co-op made a

counteroffer of $31.5 million in May 2004 because it wanted to dispose of the

Securities and remove them from its balance sheet before making the public

offering.  Southern States rejected GK Co-op's counteroffer and instead proposed

to redeem the Securities for $20 million.

At a meeting held on May 24, 2004, GK Co-op's board of directors decided

to abandon the Securities for no consideration because a $98 million ordinary loss

would produce tax savings greater than the $20 million offered by Southern States.

As a result, GK Co-op rejected the $20 million offer and ceased all negotiations

with Southern States.  At the time, GK Co-op valued the Securities at $38.8

million on its Generally Accepted Accounting Principles (GAAP) financial

statements.

On June 24, 2004, GK Co-op voluntarily and irrevocably surrendered the

Securities to Southern States and the Trust for no consideration[8] and recorded a

---

[8]GK Co-op sent Southern States and Wachovia Bank, the registrar for the
series A securities, letters dated June 24, 2004, stating that GK Co-op was
irrevocably abandoning, relinquishing, and surrendering all of its rights, title, and
interest to the Securities.  The letters requested that Southern States and Wachovia
take all necessary actions to remove GK Co-op's name and all other references to
its ownership of the Securities.  GK Co-op attached to the letter sent to Southern
States the stock certificate for the series B preferred stock and a signed stock
power.  GK Co-op also attached to the letter sent to Wachovia the certificate for
(continued...)

- 9 -

$38.8 million loss on its GAAP financial statements for the tax year ended June 30, 2004. After surrendering the Securities, GK Co-op had no further ownership interest in Southern States or the Trust. The parties have stipulated that immediately before GK Co-op surrendered the Securities they were worth at least the $20 million Southern States offered to pay for them.

On its timely filed Form 990-C for the tax year ending June 30, 2004, GK Co-op reported a $98.6 million ordinary loss deduction under section 165(a) and pursuant to section 1.165-2(a), Income Tax Regs.[9] In October 2004 GK Co-op converted from a cooperative association to a for-profit corporation and merged

---

[8](...continued)
the series A securities and a signed stock power. By letter dated June 28, 2004, Southern States acknowledged its and Wachovia's receipt of the letters and the stock certificates attached thereto. Southern States also agreed to remove GK Co-op's name from the appropriate securities registers and to take all other necessary actions to carry out GK Co-op's surrender of the Securities.

[9]The parties stipulated into evidence a copy of an opinion letter dated July 30, 2004, from the law firm of Alston & Bird, LP, to GK Co-op, setting forth its opinion as to the Federal income tax treatment of the loss that GK Co-op had incurred when it abandoned the Securities (opinion letter). Respondent objects to the opinion letter only with respect to the deficiency on the ground of relevancy because respondent has conceded the accuracy-related penalty. Therefore, respondent's objection to the opinion letter on ground of relevancy as to the deficiency is sustained because that involves an issue of law. See Fed. R. Evid. 401. In addition, the opinion letter acknowledges that there "can be no assurance that the Service will not take a position contrary to our opinion or that a court will not hold contrary to our opinion."

- 10 -

into GK Inc., and GK Inc. completed an initial public offering of its common

stock.

In 2007 petitioner completed its acquisition of all the stock of GK Inc., and

GK Inc. merged with and into petitioner.  On December 1, 2008, petitioner and

certain of its subsidiaries commenced a voluntary case under chapter 11 of title 11

of the United States Code (Bankruptcy Code) in the U.S. Bankruptcy Court for the

Northern District of Texas, Fort Worth Division.  See In re Pilgrim's Pride Corp.,

No. 08-45664 (Bankr. N.D. Tex. filed Dec. 1, 2008).

On December 21, 2009, respondent issued the statutory notice of deficiency

to petitioner as successor in interest to GK Co-op with respect to GK Co-op's tax

year ending June 30, 2004.  The notice of deficiency determined, inter alia, that

GK Co-op's loss on the abandonment of the Securities was a capital loss rather

than an ordinary loss as claimed by GK Co-op on its tax return.[10]

When the notice of deficiency was issued, petitioner was prohibited by

section 362(a)(8) of the Bankruptcy Code from filing a petition in the Tax Court to

challenge the determined deficiency.  On December 28, 2009, the debtors'

---

[10]In the petition, petitioner did not allege error with respect to respondent's
adjustments in the notice of deficiency (i) allowing GK Co-op an additional bad
debt deduction, (ii) adjusting GK Co-op's net operating loss, and (iii) adjusting
GK Co-op's minimum tax credits from an earlier year.

- 11 -

amended joint plan of reorganization under chapter 11 of the Bankruptcy Code, as

modified, became effective, and petitioner was no longer prohibited from filing a

petition in the Tax Court.[11]  On May 26, 2010, petitioner timely filed a petition in

this Court, challenging respondent's determination that GK Co-op's loss on the

abandonment of the Securities was a capital loss rather than an ordinary loss as

claimed by GK Co-op on its tax return and the accuracy-related penalty.

Respondent now concedes the penalty.  See supra note 2.

## Discussion

A.    Section 165(a)

Generally, section 165(a) allows as a deduction any loss sustained during

the taxable year that is not compensated for by insurance or otherwise.  A loss

from the sale or exchange of a capital asset is subject to the limitations on capital

losses under sections 1211 and 1212.[12]  Sec. 165(f).  In the case of a corporation,

---

[11]Respondent filed numerous proofs of claim in the bankruptcy case for various Federal taxes including, but not limited to, income tax related to the deficiency determined in the notice of deficiency.  Petitioner timely objected to the proofs of claim in the Bankruptcy Court.  Pursuant to the order of the Bankruptcy Court entered July 8, 2010, the Bankruptcy Court will resolve respondent's proofs of claim and petitioner's objection to those claims in accordance with the final resolution of the underlying Federal tax disputes in this case.

[12]Sec. 1212(a) establishes rules governing carrybacks and carryovers of a corporation's net capital losses, permitting such losses to offset capital gains in
(continued...)

- 12 -

capital losses from sales or exchanges of capital assets are allowed only to the

extent of capital gains from sales or exchanges of capital assets.  Sec. 1211(a).

Although by its terms section 1211 does not apply to gain or loss resulting from a

disposition that is not a "sale or exchange", see, e.g., Helvering v. William Flaccus

Oak Leather Co., 313 U.S. 247 (1941) (demonstrating that the term "sale or

exchange" is narrower than the term "sale or other disposition"), Congress has

enacted numerous statutes that require capital gain and/or loss in certain situations

where the dispositions are technically not sales or exchanges, including, inter alia,

section 165(g), applicable to losses for worthless securities, and section 1234A,

applicable to certain terminations of rights or obligations with respect to property

that is (or on acquisition would be) a capital asset.[13]  If a disposition of a capital

asset is not a sale or exchange or required by statute to be treated as such, section

1211 does not apply and the loss allowable under section 165 is an ordinary loss.

_____

[12](...continued)
certain earlier or later years.

[13]See also, e.g., secs. 302 (stock redemptions), 1038 (foreclosures) 1234
(loss attributable to failure to exercise certain options to buy or sell property),
1234B (certain securities future contracts), 1235 (transfers of patents other than
transfers by gift, inheritance, or devise), 1241 (cancellation of lease or
distributor's agreement), 1271 (retirement of debt instruments).

- 13 -

See, e.g., Halata v. Commissioner, T.C. Memo. 2012-351, at *19 (theft loss deducted against ordinary income).

It appeared to the Court that section 1234A might require the loss attributable to the abandonment of the Securities to be deemed a loss from the sale of a capital asset. We therefore sought the parties' views on the issue.[14] Respondent argues that section 1234A applies, but petitioner argues that it does not. We address their arguments herein.

B.    Section 1234A

Section 1234A provides:

SEC. 1234A.  GAINS OR LOSSES FROM CERTAIN TERMINATIONS.

Gain or loss attributable to the cancellation, lapse, expiration, or other termination of--

(1) a right or obligation (other than a securities futures contract, as defined in section 1234B) with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer, or

---

[14]The parties did not address sec. 1234A in their opening and reply briefs. However, because it appeared to the Court that sec. 1234A might determine the proper tax treatment in this case, we ordered the parties to file supplemental briefs on the issue. On July 2 and 5, 2013, respondent and petitioner, respectively, filed second supplemental reply briefs addressing the application of sec. 1234A to the surrender of the Securities.

- 14 -

　　　　(2) a section 1256 contract (as defined in section 1256)
　　　　not described in paragraph (1) which is a capital asset in the
　　　　hands of the taxpayer,

shall be treated as gain or loss from the sale of a capital asset. The
preceding sentence shall not apply to the retirement of any debt
instrument (whether or not through a trust or other participation
arrangement).

The parties agree that the Securities are property and were capital assets in

the hands of GK Co-op. Shares of stock are intangible interests or rights that the

owner has in the management, profits, and assets of a corporation, while the

certificate of stock is tangible evidence of the stock ownership of the person

designated therein and of the rights and liabilities resulting from such ownership.

Commissioner v. Scatena, 85 F.2d 729, 732 (9th Cir. 1936), aff'g 32 B.T.A. 675

(1935); Howbert v. Penrose, 38 F.2d 577, 579 (10th Cir. 1930); Storrow v. Tex.

Consol. Compress & Mfg. Ass'n, 87 F. 612, 615 (5th Cir. 1898). Shares of stock

"generally have been recognized as resting in contract, or, technically, as 'choses

in action.'" First Nat'l Bank of Bos. v. Maine, 284 U.S. 312, 327-328 (1932).

Stock, like any other chose in action, is a contract susceptible of ownership. See

Burnet v. Wells, 289 U.S. 670, 679 (1933) (finding that a policy of life insurance

is a contract susceptible of ownership like any other chose in action); Estate of

- 15 -

Davenport v. Commissioner, 184 F.3d 1176, 1185 (10th Cir. 1999), aff'g T.C.

Memo. 1997-390.

    The rights set forth in the certificate of the series A securities are similar to

the stock rights set forth in the certificate of the series B preferred stock.  The

series A securities, as well as the series B preferred stock, were intangible property

comprising those rights.  The value of the Securities was attributable to the

aggregate value of those intangible rights, and the loss from the abandonment of

the Securities is the result of the termination of those rights.

    Respondent asserts that the surrender of the Securities terminated all of

petitioner's rights with respect to those capital assets, and therefore section 1234A

requires that the loss be treated as a loss from the sale or exchange of capital

assets.  In contrast, petitioner asserts that under section 1234A a right or obligation

with respect to property refers only to a contractual or other derivative right to

property and not property rights inherent in the ownership of the property.

Therefore, petitioner contends that section 1234A does not apply to the

cancellation, lapse, expiration, or termination of GK Co-op's property rights in the

Securities.

    Statutes are to be construed so as to give effect to the plain meaning of the

words in the text unless we find that a word's plain meaning is inescapably

- 16 -

ambiguous.  United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-544 (1940);

Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), aff'd

without published opinion, 198 F.3d 248 (6th Cir. 1999); Rath v. Commissioner,

101 T.C. 196, 200-201 (1993).  Where legislative "'will has been expressed in

reasonably plain terms, that language must ordinarily be regarded as conclusive.'"

Negonsott v. Samuels, 507 U.S. 99, 104 (1993) (quoting Griffin v. Oceanic

Contractors, Inc., 458 U.S. 564, 570 (1982)).  We interpret the text with reference

to the legislative history primarily to learn the purpose of the statute and to resolve

any ambiguity in the words in the text.  Landgraf v. USI Film Prods., 511 U.S. 244

(1994); Commissioner v. Soliman, 506 U.S. 168, 174 (1993); Trans City Life Ins.

Co. v. Commissioner, 106 T.C. 274, 299 (1996).  "Moreover, where a statute is

clear on its face, we require unequivocal evidence of legislative purpose before

construing the statute so as to override the plain meaning of the words used

therein." Rath v. Commissioner, 101 T.C. at 200-201 (citing Halpern v.

Commissioner, 96 T.C. 895, 899 (1991), and Huntsberry v. Commissioner, 83

T.C. 742, 747-748 (1984)).

    1.    Plain Meaning

We look first to the relevant text of section 1234A:  "Gain or loss

attributable to the cancellation, lapse, expiration, or other termination of * * * a

- 17 -

right or obligation * * * with respect to property which is (or on acquisition would

be) a capital asset in the hands of the taxpayer * * * shall be treated as gain or loss

from the sale of a capital asset."

Petitioner appears to argue that, under section 1234A, it is the right or

obligation that must be a capital asset in the hands of the taxpayer, and therefore

section 1234A does not apply because GK Co-op's inherent rights in the

Securities were not themselves capital assets in the hands of GK Co-op.  The flaw

with that argument is made obvious by the facts that (1) section 1234A applies to

gain or loss on the termination of a right or obligation with respect to property that

would <u>upon acquisition</u> become a capital asset in the hands of the taxpayer, and

(2) a taxpayer cannot incur gain or loss on the termination of a right or obligation

that the taxpayer has not yet acquired.  Thus, it is not the right or obligation with

respect to property but the property itself that must be <u>or on acquisition</u> become a

capital asset in the hands of the taxpayer.  Here, the Securities were capital assets

in the hands of GK Co-op and the question is whether section 1234A applies to

the termination of the rights with respect to those capital assets when they were

surrendered.

Petitioner's primary position is that the phrase "right or obligation with

respect to property" means a contractual and other derivative right or obligation

- 18 -

with respect to property and not the inherent property rights and obligations

arising from the ownership of the property.  We disagree.

Webster's Third New International Dictionary 1934 (2002) defines the

prepositional phrase "with respect to" to mean "as regards:  insofar as concerns:

with reference to".  In its everyday usage the phrase "rights with respect to

property" includes the rights inherent in the ownership of the property, including

stock.  See, e.g., United States v. Craft, 535 U.S. 274, 282-283 (2002) (stating that

the taxpayer's husband had "the following rights with respect to the entireties

property:  the right to use the property, the right to exclude third parties from it,

the right to a share of income produced from it, the right of survivorship, the right

to become a tenant in common with equal shares upon divorce, the right to sell the

property"); Singleton v. Commissioner, 439 U.S. 940, 940 (1978) (Blackmun, J.,

dissenting) (stating that the issue was whether a cash distribution that the taxpayer

received "with respect to his shares" in a corporation was taxable to him as a

dividend or whether the distribution was an untaxed return of capital); United

States v. Byrum, 408 U.S. 125, 149 n.33 (1972) (refers to stock "with respect to

which the right to vote was retained"); Anschutz Co. v. Commissioner, 664 F.3d

313, 328 (10th Cir. 2011) (stating that agreements significantly altered the

shareholder's "dividend rights with respect to the pledged shares"), aff'g 135 T.C.

- 19 -

78 (2010); <u>Florida v. United States</u>, 285 F.2d 596, 598-599 (8th Cir. 1960)

(referring to an amended court's order that provided:  "The receiver appointed

herein is hereby vested with all of the rights and powers with respect to said stock,

including voting rights, which could be exercised by the owners of said stock at

this time".); <u>Trotz v. Commissioner</u>, 43 T.C. 127, 132 (1964) (stating that:

"Petitioner's rights with respect to the stock * * * were so complete that they were

tantamount to ownership by petitioner for the purposes of section 1239."), <u>rev'd</u>,

361 F.2d 927, 929 (10th Cir. 1966).

Most significantly, Congress has used the phrase "with respect to property"

in other provisions of the Code to include rights arising out of the ownership of

the property or characteristics of the property.  <u>See, e.g.</u>, secs. 126(e) ("no

adjustment to basis shall be made with respect to property"), 704(c)(1)(A)

("income, gain, loss, and deduction with respect to property"), 772(c)(3)(A) ("an

item of income or expense * * * with respect to property held for investment"),

877A(h)(1)(A) ("the amount of gain recognized with respect to property disposed

of by the taxpayer"), 954(i)(4)(A) ("unearned premiums and reserves of a

qualifying insurance company * * * with respect to property, casualty, or health

insurance contracts").  Indeed, Congress has used the phrase "with respect to

stock" to refer to rights arising from ownership of the stock.  <u>See, e.g.</u>, secs. 301(a)

- 20 -

("a distribution of property * * * made by a corporation to a shareholder with respect to its stock"), 993(a)(1)(E) (qualified export receipts of a corporation include "dividends * * * with respect to stock of a related foreign export corporation").

We hold that the plain meaning of the phrase "a right or obligation * * * with respect to property" encompasses the property rights inherent in intangible property as well as ancillary or derivative contractual rights.

2.    Legislative History

Petitioner asserts that the legislative history to the 1997 amendment of section 1234A shows that Congress intended that section 1234A apply only to contractual and other derivative rights and obligations with respect to property and not to the inherent property rights and obligations arising from the ownership of the property.  We disagree.

Section 1234A was added by the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 507, 95 Stat. at 333, when Congress adopted a number of provisions dealing with offsetting contractual interests in actively traded personal property commonly known as straddles.  See S. Rept. No. 97-144, at 143-154, 170 (1981), 1981-2 C.B. 412, 468-473, 480.  Congress believed that a change in the sale or exchange rule with respect to straddles was "necessary to prevent tax-

- 21 -

avoidance transactions designed to create fully deductible ordinary losses on

certain dispositions of capital assets, which if sold at a gain, would produce capital

gains."[15] Id. at 170, 1981-2 C.B. at 480.

Congress made relatively minor changes to section 1234A in the Technical

Corrections Act of 1982, Pub. L. No. 97-448, sec. 105(e), 96 Stat. at 2387, and in

the Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 102(e)(4), 98 Stat. at

624, and a major change in the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L.

No. 105-34, sec. 1003(a)(1), 111 Stat. at 909-910.  Before TRA 1997, section

1234A applied only to (1) personal property of a type that is actively traded that is

(or would be on acquisition) a capital asset in the hands of the taxpayer, except for

stock that was not part of a straddle or of a corporation that was not formed or

---

[15]As originally enacted in the Economic Recovery Tax Act of 1981 (ERTA),
Pub. L. No. 97-34, sec. 507(a), 95 Stat. at 333 (1981), sec. 1234A provided:
"Gain or loss attributable to the cancellation, lapse, expiration, or other
termination of a right or obligation with respect to personal property (as defined in
section 1092(d) (1)) which is (or on acquisition would be) a capital asset in the
hands of the taxpayer shall be treated as gain or loss from the sale of a capital
asset."  As originally enacted by ERTA sec. 501, 95 Stat. at 325, sec. 1092(d)(1)
defined personal property as "any personal property (other than stock) of a type
which is actively traded".  In the Taxpayer Relief Act of 1997, Pub. L. No. 105-34,
sec. 1003(a)(1), 111 Stat. at 909-910, Congress broadly extended the application
of sec. 1234A by substituting "property" for "personal property (as defined in sec.
1092(d)(1))".

- 22 -

availed of to take positions which offset positions in personal property of its

shareholders) and (2) "section 1256 contracts" that were capital assets.

The legislative history to TRA 1997 shows that Congress believed that the

law was deficient because (1) it taxed transactions involving capital assets that

were economically equivalent to a sale or exchange of a capital asset differently

from a sale or exchange, (2) it effectively provided some, but not all, taxpayers

with an election to treat gains from modifications of property rights as capital

gains or losses from such modifications as ordinary losses, and (3) its lack of

certainty made the tax laws unnecessarily difficult to administer. See S. Rept. No.

105-33, at 134-235 (1997), 1997-4 C.B. (Vol. 2) 1067, 1214-1315. By TRA 1997

Congress broadly extended the application of section 1234A beyond just straddles

and other transactions exploited by tax shelter promoters to all types of property

that are (or on acquisition would be) capital assets in the hands of the taxpayer.

In describing the then-current law, the Senate Finance Committee referred

to the considerable amount of litigation dealing with whether modifications of

legal relationships between taxpayers are to be treated as a "sale or exchange". Id.

at 132-136, 1997-4 C.B. (Vol. 2) at 1213-1216.  As an example, the committee

cited Fairbanks v. United States, 306 U.S. 436 (1939), where the Supreme Court

held that gain realized on the redemption of bonds before their maturity was not

- 23 -

entitled to capital gain treatment because the redemption was not a "sale or exchange". The committee also pointed to court decisions holding that a disposition that occurs as a result of a lapse, cancellation, or abandonment produces ordinary income or loss because it is not a sale or exchange of a capital asset. The committee gave the following examples: Commissioner v. Pittston Co., 252 F.2d 344 (2d Cir. 1958) (holding the amount taxpayer received for cancellation of its exclusive right to purchase coal company's entire coal output did not constitute a "sale or exchange" because the payments were in lieu of profits that would have been taxed as ordinary income), rev'g 26 T.C. 967 (1956); Commissioner v. Starr Bros., Inc., 204 F.2d 673 (2d Cir. 1953) (holding payment retail distributor received from manufacturer for waiver of contract provision prohibiting the manufacturer from selling to the distributor's competition was not a sale or exchange), rev'g 18 T.C. 149 (1952); Gen. Artists Corp. v. Commissioner, 205 F.2d 360 (2d Cir. 1953) (holding amounts received by a booking agent for cancellation of a contract to be the exclusive agent of a singer was not a sale or exchange), aff'g 17 T.C. 1517 (1952); Nat'l-Standard Co. v. Commissioner, 749 F.2d 369 (6th Cir. 1984) (holding transfer of foreign currency to discharge the taxpayer's liability was not a "sale or exchange" of that currency, and loss on transfer was an ordinary loss), aff'g 80 T.C. 551 (1983); Stoller v.

- 24 -

Commissioner, 994 F.2d 855 (D.C. Cir. 1993) (holding losses incurred before the

enactment of section 1234A on the cancellation of forward contracts to buy and

sell short-term Government securities that formed a straddle were ordinary

because the cancellation of the contracts was not a "sale or exchange"), aff'g in

part, rev'g in part T.C. Memo. 1990-659.

Petitioner points to those examples and the committee's statement that it

"believes that some transactions, such as settlements of contracts to deliver a

capital asset, are economically equivalent to a sale or exchange of such contracts

since the value of any asset is the present value of the future income that such

asset will produce."  S. Rept. No. 105-33, supra at 134, 1997-4 C.B. (Vol. 2) at

1214.  Petitioner asserts that the examples and statement show that Congress

intended section 1234A to apply only to contractual and other derivative rights

and obligations with respect to property and not to the inherent property rights and

obligations arising from the ownership of the property.  To the contrary, we do not

think that the examples do more than show that section 1234A applies broadly to

derivative contractual rights and obligations as well as inherent property rights.

We think Congress' intent that section 1234A also apply to rights inherent in the

property is evidenced by the committee's example of the redemption of a bond

which, like a share of stock, is intangible property--a bundle of contractual rights.

- 25 -

See First Nat'l Bank of Bos., 284 U.S. at 327-328 ("[B]oth [stock and bonds]

generally have been recognized as resting in contract, or, technically, as 'choses in

action.'").  The example of a redemption of a bond is most significant given that

Congress had long since overturned the result in Fairbanks by enacting the

predecessor of section 1271(a) in the Revenue Act of 1934, ch. 277, sec. 117, 48

Stat. at 714-715.

    Moreover, the Senate Finance Committee was critical of the existing law

because it taxed similar economic transactions differently and effectively provided

taxpayers with an election to sell the property right if the resulting transaction

results in a gain or extinguish the property right if the resulting transaction results

in a loss.  The intended effects of extending section 1234A to all types of property

that are capital assets "would be to remove the effective ability of a taxpayer to

elect the character of gains and losses from certain transactions" and "to reduce

the uncertainty concerning the tax treatment of modifications of property rights."

S. Rept. No. 105-33, supra at 135, 1997-4 C.B. (Vol. 2) at 1215.

    In our view Congress extended the application of section 1234A to

terminations of all rights and obligations with respect to property that is a capital

asset in the hands of the taxpayer or would be if acquired by the taxpayer,

- 26 -

including not only derivative contract rights but also property rights arising from

the ownership of the property.

3.    Amendment of Section 1.165-5, Income Tax Regs.

Petitioner also argues that the amendment in 2008 to section 1.165-5,

Income Tax Regs., generally applicable to securities that become worthless during

the taxable year, shows that the Department of the Treasury does not interpret

section 1234A to apply to property ownership rights.  Pursuant to section 165(g),

if a security that is a capital asset becomes worthless during the taxable year, the

loss resulting therefrom is treated as a loss from a sale or exchange.  The

regulation promulgated under section 165(g) clarifies that, if a security that

becomes worthless during the taxable year is not a capital asset, the loss is

deductible under section 165 as an ordinary loss.  Sec. 1.165-5(b), Income Tax

Regs.  The regulation, promulgated in 1960, was first amended in 1972 and

remained unchanged until 2008.  In 2008 the regulation was amended by adding a

new paragraph (i) which provides that (1) a security that becomes wholly

worthless includes a security that is abandoned and (2) if the abandoned security is

a capital asset (and is not a worthless security of certain affiliated corporations

described in section 165(g)(3)), the resulting loss is treated as a loss from the sale

or exchange of a capital asset.

- 27 -

Petitioner argues that, if section 1234A applies to the deductibility of a loss on abandonment of property under section 165, there would have been no reason for the Department of the Treasury to have added paragraph (i) to the regulation and concludes that: "[t]he only logical conclusion that can be reached based on the existence of the Regulation and its history is that Treasury did not, and it currently does not, believe that Section 1234A applies to the abandonment of a security." Petitioner also argues that the regulation creates an exception to section 1234A for securities in affiliated corporations. We disagree.

Under section 165(g)(3) a security in a domestic corporation that is affiliated with the taxpayer is not treated as a capital asset. Thus, the regulation does not create an exception to section 1234A; it is the more specific provision of section 165(g)(3) that creates an exception for affiliated corporations. Thus, section 1.165-5(i), Income Tax Regs., gives effect to, and is consistent with, section 1234A, as well as section 165(g)(3). Moreover, the fact that the regulation was not issued until 2008 is irrelevant. The Commissioner is not required to assert a particular position as soon as the statute authorizes such an interpretation. Dickman v. Commissioner, 465 U.S. 330, 343 (1984); Dresser Indus., Inc. v. United States, 238 F.3d 603, 609 (5th Cir. 2001); Yarbro v. Commissioner, 737 F.2d 479, 483 (5th Cir. 1984), aff'g T.C. Memo. 1982-675.

- 28 -

4.  Abandonment Losses:  Section 1.165-2, Income Tax Regs., and Rev.
    Rul. 93-80, 1993-2 C.B. 239

On its return GK Co-op claimed an ordinary loss on the surrender of the

Securities as an abandonment under section 1.165-2(a), Income Tax Regs.

However, the regulation does not apply to, and an abandonment loss deduction is

not allowed for, "losses sustained upon the sale or exchange of property, losses

sustained upon the obsolescence or worthlessness of depreciable property,

casualty losses, or losses reflected in inventories required to be taken under

section 471." Sec. 1.165-2(b), Income Tax Regs.  Consequently, GK Co-op's

claimed abandonment loss is disallowed by section 1.165-2(b), Income Tax Regs.,

because the loss from the surrender of the Securities is deemed to be a loss from a

sale or exchange of a capital asset pursuant to section 1234A.

Petitioner argues that, if section 1234A applied to the deductibility of a loss

on abandonment of intangible property under section 165 after it was amended in

1997, the commissioner would have revised Rev. Rul. 93-80, 1993-2 C.B. 239.

We disagree.

Rev. Rul. 93-80, supra, addresses the character of a loss on the

abandonment of a partnership interest when the taxpayer's share of partnership

liabilities is reduced as a result of the termination of his ownership in the

- 29 -

partnership. In situation 1 there was a deemed distribution to the partner resulting from the reduction in his share of partnership liabilities. The ruling held that the loss on the abandonment was a capital loss. In situation 2, the partner was not entitled to include any portion of partnership liabilities in the basis of his partnership interest and did not receive any actual or deemed distributions when he abandoned his partnership interest. The ruling held that the loss in situation 2 was an ordinary loss. The ruling holds that a loss incurred on the abandonment or worthlessness of a partnership interest is an ordinary loss only if sale or exchange treatment does not apply. The ruling makes clear that, if a provision of the Code requires the transaction to be treated as a sale or exchange, such as when there is a deemed distribution attributable to the reduction in the partner's share of partnership liabilities pursuant to section 752(b), the partner's loss is capital. Rev. Rul. 93-80, supra, was issued four years before section 1234A was amended in 1997 to apply to all property that is (or would be if acquired) a capital asset in the hands of the taxpayer. As we previously stated, the Commissioner is not required to assert a particular position as soon as the statute authorizes such an interpretation, whether that position is taken in a regulation or in a revenue ruling. Dickman v. Commissioner, 465 U.S. at 343; Dresser Indus., Inc., 238 F.3d at 609; Yarbro v. Commissioner, 737 F.2d at 483.

- 30 -

5.   Section 1234A Applies to Surrender of Securities

The surrender of the Securities terminated all of GK Co-op's rights with

respect to the Securities which were capital assets in the hands of GK Co-op.  The

loss on the surrender of the Securities is attributable to the termination of those

rights.  Accordingly, the loss is treated as a loss from the sale of a capital asset

pursuant to section 1234A.

C.   Conclusion

Petitioner is not entitled to a deduction for an abandonment loss pursuant to

section 1.165-2(a), Income Tax Regs., on the surrender of the Securities, because

the losses are treated as losses from a sale or exchange pursuant to section 1234A.

See sec. 1.165-2(b), Income Tax Regs.  However, pursuant to section 165(f),

petitioner is entitled to a capital loss on the surrender of the Securities, as allowed

by respondent.

In reaching our holdings, we have considered the arguments and contentions

of the parties not discussed herein, and conclude that they are moot, irrelevant, or

without merit.

- 31 -

To reflect the foregoing,

<u>Decision will be entered for respondent with respect to the deficiency and for petitioner with respect to the accuracy-related penalty</u>.

Tab 6

ORIGINAL                                    SYM

## UNITED STATES TAX COURT
### WASHINGTON, DC 20217

PILGRIM'S PRIDE CORPORATION            )
SUCCESSOR IN INTEREST TO PILGRIM'S     )
PRIDE CORPORATION OF GEORGIA F/K/A     )
GOLD KIST, INC., ET AL,                )
                                       )
        Petitioner(s),                 )
                                       )
        v.                             )   Docket No. 12089-10.
                                       )
COMMISSIONER OF INTERNAL REVENUE,      )
                                       )
        Respondent                     )

## O R D E R

On December 11, 2013, this Court filed our opinion in Pilgrim's Pride Corp. v. Commissioner, 141 T.C. ____ (2013), 2013 WL 6500132 (U.S. Tax Ct.), Tax Ct. Rep. (CCH) 59,715, Tax Ct. Rep. Dec. (RIA) 141.17. Therein we held that the plain meaning of section 1234A[1] encompasses the property rights inherent in intangible property as well as ancillary or derivative contractual rights with respect to such property and, therefore, petitioner must treat the loss on the surrender of the Securities as a loss from the sale of a capital asset under section 1234A. On January 10, 2014, petitioner filed a motion for reconsideration, and on February 18, 2014, respondent filed a response to the motion.

Reconsideration under Rule 161 "serves the limited purpose of correcting substantial errors of fact or law and allows the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding." Estate of Quick v. Commissioner, 110 T.C. 440, 441 (1998). Motions for reconsideration are generally not granted absent a showing of unusual circumstances or substantial error, e.g., mistake, inadvertence,

---

[1]All section references are to the Internal Revenue Code of 1986 in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**SERVED Mar 10 2014**

- 2 -

surprise, inexcusable neglect, newly discovered evidence, fraud, or other reason justifying relief. Id. at 441-442; see also Vaughn v. Commissioner, 87 T.C. 164, 166-167 (1986). Reconsideration is not appropriate "for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party." Estate of Quick, at 441-442.

In its motion for reconsideration, petitioner primarily makes legal arguments that we addressed in our Opinion and that respondent fully addressed in the response to petitioner's motion. Rather than addressing each of petitioner's arguments in detail, we adopt respondent's response and incorporate it herein by this reference. We also add the following comments.

To limit section 1234A to "derivative" contracts would require the Court to rewrite section 1234A(1) by inserting the word "contractual" before "rights and obligations". We will not do so, as it is our mandate to interpret the plain language of section 1234A(1), not to rewrite it. See, e.g., Lamie v. United States, 540 U.S. 526, 537 (2004); Iselin v. U.S., 270 U.S. 245, 250 (1926); Shea Homes, Inc. v. Commissioner, 142 T.C. __, __, (slip op. at p. 66) 2014 WL 552860 (Feb. 12, 2014).

We disagree with petitioner's argument that our interpretation of section 1234A(1) makes section 1234A(2) superfluous. Section 1234A(2) only applies to section 1256[2] contracts "not described in paragraph (1)." Section 1256(c)(1) treats an offset of an obligation or right with respect to a section 1256 contract as a termination even though the contract actually remains open and continues to exist and the obligation or right is not actually extinguished. Arguably, the deemed termination by offset of an obligation or right with respect to a section 1256 contract does not fall within section 1234A(1). Absent section 1234A(2), a termination by offset of a right or obligation with respect to a section 1256 contract might not be considered a "termination" for purposes of section 1234A. Section 1234A(2) ensures that gain or loss from a deemed termination by offset will be treated as gain or loss from the sale of a capital asset and, therefore, is not superfluous.

---

[2]Pursuant to section 1256(a)(1), each section 1256 contract held by the taxpayer at the close of the taxable year is treated as sold for its fair market value on the last business day of the taxable year and any gain or loss is taken into account for the taxable year. A proper adjustment is made to any gain or loss subsequently realized by the taxpayer. Sec. 1256(a)(2). Any gain or loss with respect to a section 1256 contract is capital gain or loss. Sec. 1256(a)(3).

- 3 -

We also disagree that our holding conflicts with section 165(g), which applies to losses attributable to securities that become worthless during the taxable year.  If a taxpayer abandons a capital asset and section 1234A requires the gain or loss attributable to the termination of the taxpayer's rights and obligations with respect to that property to be treated as gain or loss from the sale or exchange of a capital asset, section 165(f) allows a deduction only to the extent allowed in sections 1211 and 1212.  Our holding is controlled by section 165(f) and has no implication with respect to section 165(g).  As the Court of Appeals for the Fifth Circuit held in Echols v. Commissioner, 935 F.2d 703, 706 (5th Cir. 1991) (Echols I), rev'g 93 T.C. 553 (1989), rehearing denied 950 F.2d 209 (5th Cir. 1991) (Echols II), worthlessness and abandonment are separate and distinct concepts either of which can justify a deduction pursuant to section 165(a).  Indeed, petitioner claimed it was entitled to an ordinary loss on the abandonment of the Securities because they were not worthless at the time of the surrender.  If a security held by the taxpayer become worthless during the taxable year, the taxpayer's loss arises from the security becoming worthless.  In such an event section 165(g) limits the loss to a capital loss regardless of the taxpayer's subsequent abandonment of the security.  On the other hand, if the taxpayer abandons a security that has value, section 165(g) does not apply regardless of whether the security later becomes worthless.  In that event, however, if the security is a capital asset, section 1234A treats the loss as a loss from the sale or exchange of a capital asset.

Finally, our holding regarding section 1234A has no application to the termination of rights or obligations with respect to property resulting from a gift of the property.  Congress has consistently treated a gift as a nontaxable event, consistent with the donee's carryover of the donor's basis pursuant to section 1015(a).  See 2 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates, and Gifts, para. 40.3 at 40-10 (3d ed. 2000).  Even where a transfer is in part a gift and in part a sale, "no loss is sustained * * * if the amount realized is less than the adjusted basis."  Sec. 1.100-1(e), Income Tax Regs.  A gift of property to a charitable organization defined in section 170(c) is not a taxable event that would permit the donor to claim a loss.  Rather, it is a charitable contribution for which the donor may claim a deduction pursuant to section 170(a).

We conclude that petitioner's motion does not introduce any new evidence or establish a substantial error of law or fact.

Accordingly, it is

- 4 -

ORDERED that petitioner's motion for reconsideration, filed January 10, 2014, is denied.

*Howard A. Dawson, Jr.*

Howard A. Dawson, Jr.
Judge

Dated:  Washington, D.C.
        March 6, 2014

Tab 7

## UNITED STATES TAX COURT
### WASHINGTON, DC 20217

PILGRIM'S PRIDE CORPORATION          )
SUCCESSOR IN INTEREST TO PILGRIM'S   )
PRIDE CORPORATION OF GEORGIA F/K/A    )
GOLD KIST, INC., ET AL,              )
                                     )
          Petitioner,                )
                                     )
     v.                              )  Docket No. 12089-10.
                                     )
COMMISSIONER OF INTERNAL REVENUE,    )
                                     )
          Respondent                 )

## O R D E R

This case was submitted and briefed under Rule 122. After the parties submitted supplemental briefs pursuant to the June 29, 2012 Order, the case was assigned to the undersigned for disposition.

On October 5, 1999, GK Co-op purchased certain securities from Southern States and the Trust for an aggregate total of $98.6 million in cash. GK Co-op paid $39.2 million for 40,000 shares of Step-Up Rate Series B Cumulative Redeemable Preferred Stock (the Series B Preferred Stock) from Southern States and $59.4 million for 60,000 shares of Step-Up Rate Capital Securities, Series A (the Series A Securities) from the Trust. The parties have stipulated that the Series B Preferred Stock and the Series A Securities (collectively the Securities) are "securities" as defined by section 165(g) (2).[1]

On June 24, 2004, GK Co-op surrendered the stock certificate for the Series B Preferred Stock to Southern States with a signed stock power declaring that it was irrevocably abandoning, relinquishing, and surrendering all of its rights, title and interest to the Series B Preferred Stock. On the same day, GK Co-op surrendered the certificate for the Series A Securities to the Trust with a signed

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect on June 24, 2004.

**SERVED May 21 2013**

- 2 -

stock power declaring that it was irrevocably abandoning, relinquishing, and surrendering all of its rights, title and interest to the Series A Securities.

The parties agree that the Securities are capital assets and that petitioner is entitled to a loss under section 165(a) with respect to the surrender of the Securities. They disagree as to whether the loss is an ordinary loss under the general rule or a capital loss.

Pursuant to section 165(f) losses from sales or exchanges of capital assets are allowed only to the extent allowed in sections 1211 and 1212. GK Co-op surrendered the Securities to Southern States and the Trust for no consideration. Thus, there was no actual sale or exchange. However, pursuant to section 165(g), a loss related to a security that becomes worthless during the taxable year is treated as a loss from the sale or exchange of a capital asset. The parties focus their attention on section 165(f), petitioner arguing that at the time of surrender the Securities were worth at least $20 million, respondent arguing that the surrender of the Securities rendered them worthless.

The parties have overlooked provisions outside of section 165, such as section 1234A, that require gains or losses from certain transactions to be treated as gains or losses from sales and/or exchanges of capital assets. See also, e.g., secs. 302, 1234(a)(1) and (2), 1241, 1271(a)(1). As relevant here, section 1234A requires that a loss from the termination of a right with respect to property (other than a debt instrument)[2] that is a capital asset in the hands of the taxpayer be treated as a loss from the sale of a capital asset.

Shares of stock are intangible interests or rights which the owner has in the management, profits and assets of a corporation while a certificate of stock is a symbol or paper evidence of the stock ownership of the person designated therein and of the rights and liabilities resulting from such ownership. Handelman v. Commissioner, 509 F.2d 1067, 1071 (2d Cir. 1975); Commissioner v. Scatena 85 F.2d 729, 732 (9th Cir. 1936); Howbert v. Penrose, 38 F.2d 577, 579 (10th Cir. 1930). Abandonment of stock through the voluntary surrender of the stock

---

[2]When originally enacted, section 1234A applied only to gains or losses from the termination of rights with respect to actively traded personal property, except for stock which was specifically excluded from the application of section 1234A. In 1997, Congress amended section 1234A to apply to all types of property, including stock which was no longer specifically excluded.

- 3 -

certificates and relinquishment of all of the rights, title, and interest in the stock, terminates all rights encompassed by the ownership of the stock. Loss realized on the abandonment of stock is the result of the termination of those rights, and, pursuant to section 1234A, is treated as a loss from the sale of a capital asset.

The rights of GK Co-op set forth in the certificate of the Series A Securities are essentially rights of a shareholder in a corporation, similar to the rights set forth in the certificate of the Series B Preferred Stock. It appears to the Court that section 1234A requires that the loss resulting from GK Co-op's abandonment and surrender of the Securities be treated as a loss from the sale of a capital asset regardless of whether the abandonment rendered them worthless.[3]

The Court would benefit from the parties' views on the application of section 1234A in this case. Accordingly, it is

ORDERED that on or before July 5, 2013, each party shall file a second supplemental reply brief addressing the applicability of section 1234A to the loss realized by GK Co-op on the abandonment and surrender of the Securities.

*Howard A. Dawson, Jr.*

Howard A. Dawson, Jr.
Judge

Dated: Washington, D.C.
      May 20, 2013

---

[3]Indeed, we observe that the Commissioner has taken the position that section 1234A would apply to losses resulting from the surrender of stock in private letter rulings. See, e.g., PLR 201223021, 2012 WL 2056653 (June 8, 2012); PLR 201209014, 2012 WL 679219 (Mar. 2, 2012); PLR 201208038, 2012 WL 595526 (Feb. 24, 2012); PLR 201123042, 2011 WL 2274638 (June 10, 2011); PLR 201123043, 2011 WL 2274639 (June 10, 2011); PLR 201123044, 2011 WL 2312571 (June 10, 2011); PLR 200919055, 2009 WL 1262943 (May 8, 2009); PLR 200919056, 2009 WL 1262944 (May 8, 2009); PLR 200919057, 2009 WL 1262945 (May 8, 2009); PLR 200826026, 2008 WL 2554988 (June 27, 2008); PLR 200735019, 2007 WL 2461398 (Aug. 31, 2007). Private letter rulings are not authority for the applicability of section 1234A, and we refer to them merely as an indication of the position taken by the Commissioner.

Tab 8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the record excerpts for this

case were mailed to Counsel for Appellee at the addresses listed below or provided

to Counsel for Appellee via email through this Court's electronic Notice of Docket

Activity on this 30 day of June, 2014.

s/Robert H. Albaral _____<br>
Robert H. Albaral

**Via Certified Mail**
Gilbert S. Rothenberg
Chief, Appellate Section, Tax Division
United States Department of Justice
P.O. Box 502
Washington, DC 20044

William J. Wilkins
Chief Counsel, Internal Revenue Service
1111 Constitution Ave, NW
Washington, DC 20224

Kathryn Keneally
Assistant Attorney General
United States Department of Justice, Tax Division
601 D Street, N.W.
P.O. Box 502
Washington, DC 20044

**Via Electronic Notice of Docket Activity**
Jennifer Marie Rubin
United States Department of Justice
Tax Division, Appellate Section
P.O. Box 502
Washington, DC 20044
jennifer.m.rubin@usdoj.gov

Tab 9

## **ECF CERTIFICATION**

All required privacy redactions have been made.

The electronic submission is an exact copy of the paper document.

The document has been scanned for viruses with the most recent version of a

commercial virus scanning program and is free of viruses.


s/Robert H. Albaral
Robert H. Albaral